# ETHEL F. HUNT

*vs.*

# HANNAH M. WINKLEMAN.

*Beneficial Societies—Person Dependent on Member.*

Code, Volume 4, Article 23, Section 234, in authorizing the payment of death benefits to "a person or persons dependent" upon the member, does not limit such possible beneficiaries to persons legally or wholly dependent.     p. 252

While trivial or casual assistance or occasional charitable gifts may not be sufficient to constitute the relation of depend-ence within the meaning of the statute, yet where the beneficiary named in the certificate received, and relied and was dependent upon, some substantial and material support and assistance from a member, under circumstances rendering such support lawful and proper, she is clearly within the meaning of the statute and the benevolent purpose of such associations.    p. 253

A sister-in-law of a member who, after the death of her sister, the member's wife, lived in the member's home, both contribut-ing from their earnings to run the home, which neither of them could have kept up without the other, was dependent upon him, within the meaning of the statute authorizing the payment of death benefits to "a person or persons dependent upon" a mem-ber.     p. 261

*Decided March 16th, 1920.*

Appeal from the Circuit Court of Baltimore City (AMBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ., BURKE, J., by reason of his resignation, not participating in the decision.

*Linwood L. Clark,* for the appellants.

*Thomas Burling Hull,* with whom was *J. Bibb Mills* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

The Supreme Conclave, Improved Order Heptasophs, issued in 1898 to George W. Fowler, a member of Gem Conclave No. 8, Improved Order Heptasophs, a certificate for $1,000.00, payable at his death to his wife, Lillie V. Fowler. Mrs. Fowler died on June 5th, 1915, and on the 23rd of that month George W. Fowler surrendered his old certificate and applied for a new certificate payable to his sister-in-law, Hannah M. Winkleman, who, he stated in a letter to the secretary of Gem Conclave No. 8, had given up her position to nurse his wife and was dependent upon him, and a certificate was accordingly issued to him by the Supreme Conclave on June 26th, 1915, payable to "Sister-in-law, Hannah M. Winkleman, Dependent." In May, 1917, "there was a merger" of the Supreme Conclave, Improved Order Heptasophs, and the Fraternal Aid Union, of Lawrence, Kansas, and the Fraternal Aid Union assumed liability for the death benefits provided for in certificates previously issued by the Supreme Conclave, Improved Order Heptasophs. George W. Fowler died in October, 1918, and Hannah M. Winkleman, in accordance with the requirements of the certificate, filed with the Fraternal Aid Union proof of death and her claim to the amount named in the certificate. About the same time certain of the next of kin of George W. Fowler notified the Fraternal Aid Union that they claimed the proceeds of the certificate. Thereupon the Fraternal Aid Union filed a bill of interpleader in the Circuit Court of Baltimore City against Ethel F. Hunt and others, claiming as next of kin, and Hannah M. Winkleman, and in pursuance of a decree of interpleader Ethel F. Hunt and others, as plaintiffs, filed a bill of complaint in said Court against Hannah M. Winkle-

man, defendant. The bill of complaint alleges, and the answer of Hannah M. Winkleman admits that the Fraternal Aid Union is "a fraternal beneficiary association as defined in Sections 229 to 242 of Article 23 of the Code, as amended by Chapter 824 of the Acts of 1912 (Code, Vol. 3, Art. 23, Secs. 229-244, inclusive)" and the record contains an agreement of counsel that the "persons and relations" authorized to receive benefits under the constitution and by-laws of the Fraternal Aid Union are those mentioned in *Bagby's Code*, Vol. 4, Art. 23, Sec. 234; that under said constitution and by-laws a member may change his beneficiary at any time by surrendering his old certificate and designating another beneficiary, within the list of those authorized to receive the same, and that upon the death of a member, if the beneficiary cannot take, the benefits are payable to the member's next of kin.

Section 234 of Art. 23, Vol. 4 of the Code, provides that, "The payment of death benefits shall be confined to wife, husband, relative by blood to the fourth degree, father-in-law, mother-in-law, son-in-law, daughter-in-law, stepfather, stepmother, stepchildren, children by legal adoption, or to a person or persons dependent upon the member," and it is therefore apparent that as a sister-in-law is not among those named in the Statute, the right of Hannah M. Winkleman to the proceeds of the certificate must depend upon whether she was dependent upon George W. Fowler at the time of his death. *Dittmaier* v. *Supreme Conclave, Improved Order Heptasophs,* 135 Md. 312.

The Court below dismissed the plaintiffs' bill and awarded the fund to Hannah M. Winkleman, and this appeal is by the plaintiffs from that decree.

The Statute provides for two distinct classes of beneficiaries: (1) those named, to whom benefits may be paid without regard to whether they were dependent upon the member or not, and (2) a person or persons dependent upon the member. And it is apparent, we think, that the statute

does not limit the second class of beneficiaries to those *legally or wholly* dependent upon the member, for after naming those legally dependent, or who would likely be wholly dependent, as entitled to receive benefits whether dependent or not, it makes provision for others who may be dependent upon the member. Moreover, prior to amendment by the Act of 1912, Ch. 824, Sec. 229 of Art. 23 of the Code, described those who could take as dependents as persons dependent upon the member for either food, lodging, clothing or education, showing clearly that the Legislature did not by Section 229 intend to confine that class of beneficiaries to persons legally or wholly dependent upon the member, and there is nothing in the Act of 1912 indicating a purpose to restrict rather than enlarge the meaning of the term dependent.

While trivial or casual assistance, or occasional charitable gifts may not be sufficient to constitute the relation of dependency within the meaning of Section 234, Art. 23, Vol. 4 of the Code, yet where the beneficiary named in the certificate received, and relied and was dependent upon some substantial and material support and assistance from a member, under circumstances rendering such support lawful and proper, she is clearly within the meaning of the statute and the benevolent purpose of such associations. It is said in 1 *Bacon's Benefit Societies, etc.* (4th Ed.), Sec. 336, after a review of numerous decisions: "From the definition and cases cited it seems that whether or not a person is included among the dependents of a member of a benefit society is a question of fact, and that each case must be decided upon its own merits. In accordance with the liberal view of the Supreme Court of Michigan, in defining who are included in the term family, we should say that if any person, relative of the member or not was supported by him, directly or indirectly, or wholly or in part, at his home or abroad, because of a legal or moral obligation, or merely from affection, such person might be called a dependent and be designated as the beneficiary of such member. But in all cases it would ap-

pear essential to apply the test of good faith, for mere capricious liking or temporary liberality in the way of gifts would not make the recipient a dependent." The case most frequently cited and relied upon is the case of *McCarthy* v. *Order of Protection*, 153 Mass. 314, 26 N. E. 866, 11 L. R. A. 144. The statute construed in that case provided that "a corporation organized for any purpose in Sec. 2 may, for the purpose of assisting widows, orphans or other relatives of deceased members or any persons dependent upon deceased members, provide in its by-laws for the payment by such member of a fixed sum to be held by such association until the death of a member occurs, and then to be forthwith paid to the person entitled thereto," and the Court said: "It is evident from the language here used that while widows, orphans or other relatives may be 'persons dependent upon' a deceased member, it is within the contemplation of the statute that a person may be dependent upon a deceased member who is not a widow, or orphan, or relative of such member, and that it is one of the objects of the statute to provide that such persons may share in the benefits of the association which may be organized under it. The purpose seems to have been to provide that 'widows, orphans or other relatives,' whether dependent or not, might be designated as beneficiaries, and that any other person, who is dependent upon a member, although not a widow, or orphan, or other relative, may also be designated by him as a beneficiary. * * * Nor is there anything in the statute which requires that the dependent person should be legally or wholly dependent upon a member. On the contrary, the enumeration of the classes of persons who would be legally dependent upon a member, followed by a phrase distinctly intended to include other persons, would seem to establish conclusively that legal dependency was not the test. Nor can it be justly said that if the beneficiary is dependent in part he or she is not dependent. Cases will readily occur to one in which persons are partly supported or partially assisted by others. It would be giving

an unnecessarily harsh construction to a statute which the
Court had said should be construed 'liberally and in such a
manner as to carry out the benevolent purpose sought to be
provided for' to hold that such cases were excluded from it."
After stating what would not constitute the relation of de-
pendency, the Court said further: "Something more is un-
doubtedly required.  The beneficiary must be dependent upon
the member in a material degree for support, maintenance,
or assistance, and the obligation on the part of the member
to furnish it must, it would seem, rest upon some moral, or
legal, or equitable grounds, and not upon the purely volun-
tary and charitable impulses or dispositions of the member."

That case was decided in 1891, and in support of the defi-
nition there given of a dependent the Court cited *American
L. of H.* v. *Perry,* 140 Mass. 580, 5 N. E. 634; *Bacon on
Benefit Societies,* 261; *Ballou* v. *Gile,* 50 Wis. 614.   In
*American L. of H.* v. *Perry,* the Court adopted the definition
given in *Ballou* v. *Gile,* where the Supreme Court of Wis-
consin said: "We think the true meaning of the word depend-
ent, in this connection, means some person or persons de-
pendent for support in some way upon the deceased."   When
the case of *McCarthy* v. *Order of Protection, supra,* and that
part of the definition of a dependent which requires the
'obligation' of the member to 'rest upon some moral or legal or
equitable grounds' is interpreted in the light of the later case
of *Wilber* v. *Order of Protection,* 192 Mass. 477, decided in
1906, and the case of *Order of Foresters* v. *Heffernan,* 283
Ill. 429, decided in 1918, it would seem to be in substantial
accord with the statement of the text of the late (4th) edi-
tion of *Bacon's Benefit Societies* from which we have quoted.
In *Wilber's Case* the beneficiary named in the certificate and
her two sisters, Agnes and Georgiana, were keeping house to-
gether in Cambridge.   The beneficiary and Agnes worked out
and earned the money necessary to maintain the home, and
Georgiana, who was not strong, did the house work.   This
was known to the deceased member before he married Agnes

in 1897. Before her marriage Agnes said to him that she
would not marry and break up the home of herself and sis-
ters, and he replied that if she would marry him the sisters
should go with her and have a home as long as they lived.
After the marriage the old home was broken up and the sis-
ters' of the beneficiary went to live with her husband under
an arrangement by which Agnes ran the house and Georgiana
helped in the work, while the beneficiary and the decedent
worked out and supported the family, he contributing from
twelve to fifteen dollars a week and she four dollars a week,
which sums were turned over to Agnes who ran the house,
etc. The beneficiary testified that after the death of Agnes
the decedent said "we would go on keeping house the same
as we did before my sister died, giving in together and keep-
ing house," and also said that "If we would keep on keeping
house for him, we might go on and live the same way we had
been living." In pursuance of that arrangement the home
was kept up as before until the death of the decedent, Georg-
iana acting as treasurer. There was also evidence that dece-
dent after the death of Agnes told the beneficiary that he had
made her one of the beneficiaries "because his children (by a
former marriage) all had good homes, and that if anything
happened to him she had her sister Georgiana to look after
and needed the money." In disposing of the case the Su-
preme Judicial Court of Massachusetts, after quoting from
*McCarthy* v. *Order of Protection, supra,* said: "In the pres-
ent case the jury might properly have found that Lucy (the
beneficiary) was dependent upon the assistance of Wilber
(the deceased member) to support herself and Georgiana in
his lifetime in the same degree of comfort in which they had
lived before his marriage to Agnes, and that Wilber had
agreed in substance that the family should not be broken up,
and that such loss as might be suffered from the fact that
Agnes, in consequence of her marriage, had become a non-
producer, should be made up by his contribution to the com-
mon fund. They might further have found that after the

death of Agnes it was the assistance so rendered by Wilber which enabled Lucy and Georgiana to live in the same degree of comfort as before, and that this assistance was given and received, not as a gratuity, but under a mutual recognition of a moral obligation on the part of Wilber to stand to his promise; and that under the pressing sense of such an obligation Wilber made Lucy a beneficiary under the policy. In other words, the jury might have found that the assistance was not trivial or casual or wholly charitable, but was substantial and material, and that the obligation to furnish it, although perhaps not enforceable in law, nevertheless rested upon moral and equitable grounds, and that it was furnished not gratuitously, but in recognition of that obligation. This was enough." In the case of *Order of Foresters* v. *Heffernan, supra,* Miss Heffernan, the beneficiary, owned the home in which she and the deceased member of the association lived. "They both worked at neckwear down town, and Miss Ryan (the deceased member) did most of the housework and carried piecework home with her to occupy her while not engaged in house work." While they both earned wages, it did not appear from the record how they spent their wages, and there "was no positive evidence in the record as to whether or not Miss Ryan paid board or lodging to Miss Heffernan, and no positive evidence as to whether one or both of them furnished the food for the table." They were always seen together wherever they went, and were referred to by some of the witnesses as dearer to each other than sisters. They had no housekeeper or other person living with them at the time of Miss Ryan's death, and they cared for each other during sickness as one member of a family would another. After referring to a number of earlier cases, and after quoting from the cases of *McCarthy* v. *Order of Protection, supra,* and *Ballou* v. *Gile, supra,* and after saying: "The cases generally hold upon this question that it is sufficient to show that a beneficiary is a dependent if he receives

·some substantial support or assistance from the insured, such
as food, clothing, lodging or education, as named in this par-
ticular policy in question, or some other substantial aid and
support, provided such aid or support rests upon some moral,
legal or equitable ground and not upon purely voluntary or
charitable impulses or disposition of the member," the Court
disposed of the case as follows: "The appellee and Miss
Ryan were the very closest of friends. Their relationship
was not mercenary or contractual, so far as this record shows.
They were constant companions in sickness and in health,
and supported each other during their sicknesses, according
to the testimony of witnesses, in the same way sisters aid
each other. While it does not positively appear by the evi-
dence, the inference is that Miss Ryan always lived in the
home of Miss Heffernan and her father and brother as a
member of the family would live, and that after the death
of the father and brother of Miss Heffernan they were
mutual supports and aids to each other, Miss Ryan being the
housekeeper and Miss Heffernan furnishing Miss Ryan with
lodging, and both aiding each other and waiting upon each
other in sickness and mutually contributing to the food they
both ate. This evidence tends strongly to support the con-
tention that the appellee was a dependent of Miss Ryan, if
not a member of her family, and she is entitled to recover
said fund." See also *Goff* v. *Supreme Lodge, Royal Achates,*
90 Neb. 578, and *Keener* v. *Grand Lodge, etc.,* 38 Mo. App.
543.

In the case at bar George W. Fowler and the appellee's
sister were married in February, 1895, and after their mar-
riage Mr. Fowler return to New York, where he was then
living, and his wife went to the home of the appellee and her
father, mother and brother, in Baltimore City where she re-
mained until April when she joined her husband in New
York, and lived at the home of his sister until the following
September. In September Mr. and Mrs. Fowler returned to
Baltimore and made their home "off and on" with the appel-

lee and her father and mother until the father died. After
the father's death in January, 1905, Mr. and Mrs. Fowler
remained with the appellee and her mother until the follow-
ing July when they went to New York "to make their perma-
nent home," and there being no longer any "occasion" for the
appellee and her mother to keep house, they "broke up" their
home and went to board with the mother's sister in Baltimore,
and lived there until November, 1907, when the mother went
to New York to live with Mr. and Mrs. Fowler. After her
mother went to New York the appellee, who had a position
in Baltimore, continued to live with her aunt. When asked
to explain to the Court how she happened later to go to New
York, the appellee said: "Well, Mr. Fowler was always op-
posed to me staying in Baltimore alone; he said mother
was there and sister was there, and he always wanted me.
And he was always after me to make my home with them.
Well, I always told him that I had a position here and did
not want to give it up, but I laughingly said to them, if you
will come on to the Star Spangled Banner Celebration here,
I will go back with you. They came to the celebration, and
Mr. Fowler held me to it, so on about the 26th of Septem-
ber, 1914, I gave up my position and went to New York to
live at their solicitation." She lived in New York with Mr.
and Mrs. Fowler, who, with her mother and herself, consti-
tuted the family. Mrs. Fowler died on June 5th, 1915, and
was buried in Baltimore, and after the funeral the appellee
and her mother and Mr. Fowler returnd to New York, where
the appellee and her mother continued, at Mr. Fowler's re-
quest, to keep house for him until the 31st of July, when
they returned to Baltimore and Mr. Fowler rented a house
on Montpelier Street, where they lived about two months.
Being unable to secure a position in Baltimore Mr. Fowler
decided to go back to New York, and they gave up the house
and the appellee and her mother went to live with the aunt
with whom they had lived before. Mr. Fowler only stayed
in New York about two months, until December, when he
came back to Baltimore and to the home of the appellee's

aunt, where the appellee and her mother were living. Her aunt expected and wanted him to go to his own people, but Mr. Fowler said he wanted to be with the appellee and her mother and the aunt consented. In January, 1916, Mr. Fowler secured a position with the United Railways Company. In February and March, 1916, he was very sick with pleurisy, and during his sickness was always saying to the appellee and her mother, "When will we get another home?," so after he got well they "consented" that if he would get a house they would go to live together again. Mr. Fowler accordingly rented a home on Gilmor Street, and he and the appellee and her mother lived there about eighteen months. They then moved to Dennison Street and lived there until June, 1918, when Mr. Fowler bought the house on Brunswick Street, where they were living at the time of Mr. Fowler's death. When asked what arrangements they had in the conduct of the house, as to the "management and financing," the appellee said that Mr. Fowler bought the house, and that he was paid every ten days by the Railway Company; that he "allowed her mother" so much money to live on, and "If it wasn't enough we did not ask him for any more; we did what we could with it. In the meantime I used my salary to help out. As far as Mr. Fowler was personally concerned, he didn't know whether anything was paid, he assumed they were and they were, but to know that he knew it, he did not, for he never asked." She further testified that her mother had no means except what she, the appellee, earned, and that she only had her position; that when they were living in New York she only had a position for a few weeks before her sister's death, and when her sister died Mr. Fowler told her she would have to give it up at once and take charge of the house; that after they returned to Baltimore she did not have a position until the following March, when she went to work for Oppenheim-Obendorf, where she received $6.00 a week for about six months, and after that she got $7.00 a week; that she worked for Oppenheim-Obendorf until September, 1917, when she went to work for "the Methodist Protestant

Book Concern," where she is still employed and where she received $12.00 a week until September, 1918, a month previous to Mr. Fowler's death, when her salary was increased to $15.00 a week; that when Mr. Fowler was first employed by the Railway Company in January, 1916, he got $1.75 a day, and that he continued to receive that amount for about five months and until he was transferred to the "Retreat barn"; that after that his salary increased rapidly, and at the time of his death he was getting $5.00 a day; that her mother, who was about seventy-four years of age, did the cooking and "went some errands," but that she, the appellee, did the house work, "did it at night and got up early in the morning and did it" before she "went to the office"; that from March, 1916, when she got the position with Oppenheim-Obendorf, to the time of Mr. Fowler's death the home was run on their "joint earnings," and that "neither one of us could have kept the home without the help of the other."

This evidence, which is uncontradicted, fully establishes the appellee's right to the fund in question. She was not only dependent upon Mr. Fowler at the time the old certificate was surrendered and the new certificate, in which she was designated as the beneficiary, was issued, but at the time of his death she was receiving from him substantial assistance upon which she relied and was dependent for the maintenance of their home. While Mr. Fowler was under no legal obligation after his wife's death to make his home with the appellee and her mother, he did so not at their request or suggestion but at his own instance, as the most agreeable and acceptable arrangement by which he could secure the comforts of a home. In response to his repeated requests and the requests of his wife the appellee gave up her position in Baltimore in order to make her home with them in New York, and from that time to the time of her sister's death, with the exception of a few weeks when she had a position there, she was wholly dependent upon Mr. Fowler. After her sister's death the appellee and her mother

returned to Baltimore with him and kept house for him until he decided to return to New York in order to secure a position. He remained there only about two months and then returned to Baltimore and went to the home of the appellee's aunt, where the appellee and her mother were then living, because he preferred to be with them. After he secured a position, in January, 1916, with the Railways Company, and during his illness, he persuaded the appellee and her mother to agree to an arrangement by which he and they could have a home together again, and accordingly he rented a house, and they lived together as one family until his death, the mother performing such part of the household duties as her old age and health permitted, while the appellee did the rest of the work and contributed to the maintenance of the home out of her own earnings. The money he gave to the mother for the support of the home was not given by him or received by the appellee and her mother as a charity, but as his contribution to the fund to be expended and necessary for their common good, and in the light of the authorities referred to, it could hardly be said that his obligation to render such assistance rested upon no equitable or moral ground.

The cases relied on by the appellant are not in conflict with those we have cited. For instance in the case of *Ownby* v. *Supreme Lodge, K. of H.,* 101 Tenn. 16, the only assistance rendered the beneficiary was in the nature of voluntary gifts or occasional presents, and in the case of *Morey et al.* v. *Monk,* 145 Ala. 301, the Court held that a man who was "grown and married, earning a good salary and saving money" could not be regarded as a dependent.

*Decree affirmed, with costs.*